FISERV SOLUTIONS, INC., et al., Appellants-Respondents, v XL SPECIALTY INSURANCE COMPANY, Respondent-Appellant. (And Another Action.) [943 NYS2d 1]—

Order, Supreme Court, New York County (Melvin L. Schweitzer, J.), entered March 23, 2011, which granted in part and denied in part plaintiffs Fiserv Solutions, Inc., Suntrust Bank, Compass Bank, Regions Bank, Altier Credit Union, Sovereign Bank, and ORNL Federal Credit Union's motion for summary judgment, and granted in part and denied in part defendant XL Specialty Insurance Co.'s motion for summary judgment, modified, on the law, to the extent of granting summary judgment to plaintiffs and declaring that the policy provides coverage where, solely by virtue of Fiserv's rounding up to the nearest dollar, the guaranteed insured value reflected in the remittance reports sent by Fiserv to XL exceeds the maximum value in the HVB range, and otherwise affirmed, with costs.

The motion court correctly determined that XL's policy insures the range of value generated by the Fiserv program called HomeValueBot (HVB), and not, as asserted by plaintiffs, any amount selected by the lender within the HVB range when that amount is later determined to be greater than the actual market value upon a retrospective appraisal. The purpose and intention of the policy is ascertained upon examination of the service provided by Fiserv to lenders, and the reason why insurance was required.

Plaintiff Fiserv is a financial services company that provides mortgage lenders with home value appraisal services by using computer programs to generate appraisals, thus eliminating the need for the lenders to hire human appraisers. Fiserv used a computer appraisal method known as the automated valuation model (AVM) which stated a single dollar appraisal figure, with a plus or minus percentage margin of error. The insurance policy, which provides property valuation insurance, is intended to insure the accuracy of the appraisals and to cover losses sustained by the lenders by virtue of faulty appraisals provided by Fiserv.

The named insured is Fiserv and the lenders are additional insureds, with insurance provided for "Faulty Original Appraised Value." The policy defines "Original Appraised Value" as the value set forth in the AVM, and a "Faulty Original Appraised Value" as when the appraisal generated by the AVM is greater than the actual market value of the property at the time of loan origination, the actual market value being determined by a certified (human) appraiser of the property after a loan goes into default.

Fiserv also used a computer program called a HomeValueBot (HVB) which, rather than providing a single number for an appraisal, gave a range within which lenders could choose an appraisal amount and determine how much to lend. Defendant agreed to insure those HVB appraisals and issued an endorsement to the policy, which expanded the definition of "Original Appraised Value" to include the value of the property as reported from an HVB where the insured appraised value does not exceed the HVB's indicated range.

When Fiserv was providing a specific dollar amount for its appraisals and the lenders chose that value, the lenders had insurance for a loss when that number was higher than the amount later assigned by a human appraiser after the loan had gone into default. When Fiserv began offering the HVB range of appraisals, the lenders were insured for a loss if the range was so wrong (so high) that the lenders could pick even the lowest

number in the range and still be choosing a value higher than the retrospective human appraisal. It is Fiserv's HVB range that is at issue here.

Fiserv's interpretation of the policy—that any appraisal number within the range and chosen by the lender is covered by insurance in the event that the number is greater than the actual market value as later determined by a human appraiser—is not, as the dissent argues, the only reasonable interpretation. To the contrary, common sense tells us that this is not a logical interpretation. Fiserv's service to lenders is to provide an appraisal range within which lenders can select a value and grant a loan, and Fiserv, the named insured, has no control over the amount that the lenders select within the range. If the dissent and Fiserv are correct, then XL was insuring the lender's conduct, not the failings of Fiserv. This is not a reasonable interpretation of the policy which was issued to insure the accuracy of Fiserv's appraisal methods, not the bad choices of the lenders. The policy is not default insurance. Both Fiserv and XL agree that the purpose of the policy is to insure the accuracy of Fiserv's appraisals, not the lender's underwriting decisions.[1] Thus, when an appraisal value is based on an HVB range, there is no coverage if the retrospective human appraisal falls within that range.

Fiserv argues that under XL's interpretation, the only way that a lender could be fully protected under the policy would be for it to always identify only the lowest dollar amount of the HVB range of value as the appraised value when making a loan, and that using any higher dollar amount would reduce the possibility of coverage available to the lender if the value used by the lender later proved to be overstated. That is correct, but it does not mean that XL's interpretation of the policy is incorrect. It is the lender's choice to use the HVB range of value when appraising a property, and the lender's choice of what amount to choose within that range. If the lender chooses the high end of the range, it follows that there is more room for overvaluing the property than if it chooses the low end of the range. That is the lender's business decision, involving a

---

1. XL's statement of undisputed facts pursuant to rule 19-A of the Commercial Division Rules sets forth, among other things, the testimony of Fiserv's CEO that the insurance was designed to provide a guarantee of the accuracy of any valuation product that was delivered to a client, as well as the testimony of several lenders that they obtained the insurance to cover their losses if there was an inaccurate HVB and the property was overvalued. Fiserv's director of risk management acknowledged that the coverage wasn't a substitute for prudent underwriting or losses caused by poor underwriting and that the policy did not cover such losses.

calculated risk. Again, it is only the HVB range that is being insured, not the lender's choice of value within that range.

The dissent points to the definition of "Original Appraised Value" found in the policy endorsement covering HVBs, specifically language stating the original appraised value means the value as set forth in an HVB where the insured appraised value does not exceed the HVB's indicated range of value. This, according to the dissent, confirms that the accuracy of a single value out of the range, and not the range, is being insured. However, this concedley inartful and somewhat superfluous language serves only to limit coverage as follows: if the lender assigns a value *higher* than the range provided by Fiserv, it won't be insured, *even if the range was wrong because it was too high*. Conversely, if the lender picks a number within the range, and the range was wrong in that even the lowest number in the range was too high, then the lender has insurance for Fiserv's miscalculation.

The dissent posits that XL's position directly conflicts with the loss calculation provisions of the policy and that under XL's interpretation, it would be impossible to calculate a loss if a range of values is being insured. Notably, Fiserv has not argued that XL's position makes it impossible to calculate a loss. In fact, Fiserv indicates in its memorandum of law that the formula used to determine the amount of insured loss is not at issue in this appeal. And, the record shows that the loss calculation provisions cited by the dissent can be, and have in fact been used to calculate a loss by applying XL's interpretation of the policy. An example of such a calculation was included in an e-mail sent by XL to Fiserv's assistant vice president, claims manager, in which specific provisions of the policy, including the loss calculation provisions, are set forth in explanation of the following calculation where the lender had sought coverage for a loss of $20,460.79 representing the outstanding balance of its loan: "In this case, HomeValueBot estimated that the underlying property was worth between $99,929.31 and $122,135.83. The actual market value, according to the retrospective appraisal provided by [the lender], was $91,000. The difference between these values is $8,929.31 ($99,929.31 minus $91,000, equals $8,929.31). Since that amount is less than [the] amount due on [lender's] loan, [lender] is only entitled to recover that amount."

As noted by the dissent, for nearly four years after the policy was expanded to include the HVB range of appraisals, XL continued to (mistakenly, in our view), pay claims as it had when Fiserv had only been providing specific dollar appraisals, with XL covering any value that the lenders used from the HVB

range if that amount was less than the retrospective human appraisal. However, when a new internal claims manager eventually reviewed the claims, she concluded that there had been erroneous payment in the many instances where the insured appraised value had been a number within the HVB range. XL's unnecessary payment of claims that were not intended to be covered under the policy should not prevent it from now enforcing the meaning and intent of the policy.

The motion court's order is modified to the extent of granting summary judgment to plaintiffs declaring that the policy provides coverage where, solely by virtue of Fiserv's rounding up to the nearest dollar, the guaranteed insured value reflected in the remittance reports sent by Fiserv to XL exceeds the maximum value in the HVB range. As explained by plaintiffs, on an approximately monthly basis, Fiserv sent a list of loans closed by insured lenders (including the lender plaintiffs) "with the values used to originate each one—i.e, the insured loan amount and insured property value—to FLS's broker for delivery to XL, along with payment of the corresponding premium." These reports were referred to as remittance reports. According to plaintiffs, "[w]hen the lender used HVB to originate a loan, the lender would report to FLS [Fiserv] the value within the HVB range that it used. When that value was the high value in the HVB range and HVB reported the value at the top of the range as dollars and cents, the computer system transferring HVB information would in some instances automatically round the number up or down to the nearest value."

Plaintiffs have provided an illustrative example where an HVB printout for a particular property set forth an insurable HVB range from $132,026.06 to $145,923.53, and the remittance report sent by Fiserv to XL listed the guaranteed appraised value for that property as $145,924. Essentially, it was the software system used to report the loan transactions to XL that rounded up the amount of the guaranteed appraised value to the next dollar, 47¢ higher than the highest value listed in the range provided by HVB. Defendant does not claim that any deviation from exact performance caused by Fiserv's rounding to the nearest dollar in its remittance reports affected the appraisal amount chosen by the lender, the amount loaned or the size of any claim against XL. Significantly, XL accepted the premiums paid by the lenders for those appraised values that were rounded up to the nearest dollar, while it now argues that the values are beyond the HVB range and accordingly, uninsured.

A technical failure or immaterial breach should not furnish

the insurer with a valid basis for voiding its obligation (*see generally Jacob & Youngs, Inc. v Kent*, 230 NY 239, 243 [1921, Cardozo, J.] ["We must weigh the purpose to be served, the desire to be gratified, the excuse for deviation from the letter, the cruelty of enforced adherence"]; *see also High Fashions Hair Cutters v Commercial Union Ins. Co.*, 145 AD2d 465, 466 [1988]; *Russell v Lornamead, Inc.*, 2011 WL 1567000, *14, 2011 Conn Super LEXIS 853, *39 [Super Ct 2011]). Here, interpreting the contract to require precise reporting by Fiserv to the penny so that the rounded up figure does not exceed the high range of the HVB would result in a draconian forfeiture of the coverage paid for by the lenders, especially in light of their payment of premiums and XL's retention of those premiums based on the remittance reports with the amounts rounded to the nearest dollar.

As to the remaining issues raised by defendant, Fiserv has an insurable interest in the property valuation insurance policy issued by defendant, because it is exposed to potential liability to plaintiff lenders for any losses incurred on the subject loans (*see Calabrese v New London County Mut. Ins. Co.*, 21 Conn L Rptr 67 [Super Ct 1997]; *see also Jones v Equicredit Corp. of S. Carolina*, 347 SC 535, 542, 556 SE2d 713, 717 [2001]).

Finally, in light of endorsement No. 1, which provides that "this policy does not require sale and/or foreclosure as the sole proof of Loss" and that "proof of a pending Loss by review of the lender's charge off analysis" is a "reasonable alternative[ ]," the 30 days within which a claim under the policy must be submitted begins to run after the sale or appraisal of the property, the charge-off of the loss, or, as the motion court found, "any other event that leads the lender to recognize the potential for loss." As we previously held, defendant may deny claims if it can show that an insured lender did not comply with its own procedures and requirements (*see Fiserv Solutions, Inc. v XL Specialty Ins. Co.*, 84 AD3d 480 [2011]). Concur—Catterson, Renwick and Abdus-Salaam, JJ.

Mazzarelli, J.P., and Moskowitz, J., dissent in a memorandum by Moskowitz, J., as follows: This appeal hinges on the interpretation of the following paragraph in a property valuation insurance policy: "Original Appraised Value means the value of the Secured Property set forth as an automated property valuation (AVM), or as reported from . . . an automated HomeValueBot (HVB) where the insured appraised value does not exceed the HVB's indicated range of value report collected or requested by the Insured for the Originator on or prior to the extension of the Loan to the Borrower"

In my view, the policy insured the accuracy of the single value selected by the mortgage lenders from the range of values that plaintiff Fiserv's computer program generated. In addition, the policy clearly states that, where the value the lender chose exceeds the high end of the computer-generated range, even as a result of simple rounding to the nearest whole dollar, the policy provided no coverage. Accordingly, to the extent the majority holds otherwise, I respectfully dissent.

Plaintiff Fiserv is a financial services company that provides banks with services, including accounting, data processing, loan closing and loan handling. Fiserv also provides mortgage lenders with home value appraisal services by supplying computer programs that appraise home values. The service at issue in this dispute is the provision of computer-generated home appraisals. For a per-loan fee, Fiserv provided mortgage lenders with appraisals that it made electronically by inputting data such as square footage and building age. These computer appraisals were commonly known as automated valuation methods (AVMs). By using AVMs, lenders saved the expense of a human appraiser's visit to the property. Plaintiffs Suntrust Bank, Compass Bank, Regions Bank, Altier Credit Union, and Sovereign Bank (the Lenders) are some of the banks that issued home mortgage loans based on Fiserv's AVM appraisals.

Anticipating the possibility of errors in the AVM's, Fiserv secured insurance, on behalf of the Lenders, against inaccurate appraisals. This coverage was known as property valuation insurance. In June 2004, defendant XL Specialty Insurance Company (XL) issued the property valuation insurance policy to Fiserv, and each lender that used Fiserv's services became an additional insured under the policy. In the policy, XL agreed "to pay the Insured any covered Loss resulting from a Default of a Loan and a Faulty Original Appraised Value."

Pursuant to the policy, a "Faulty Original Appraised Value" existed when the appraisal generated by Fiserv's AVM's was greater than the actual market value of the property at the time the loan was originated. The actual market value was determined by sending a certified appraiser to the property, after a loan went into default, to conduct the in-person appraisal that AVM's were designed to replace. The policy initially defined the term "Original Appraised Value" as "the value of the Secured Property set forth as a Stated Owners Estimate (SOE) in the loan application process, or an automated property valuation (AVM), or as reported from a desktop valuation report (Desktop) or Evaluation/Broker Price Opinion (BPO) report collected or requested by the Insured for the Originator on or prior to the extension of the Loan to the Borrower."

The AVMs typically stated a single dollar appraisal figure, along with a plus or minus percentage margin of error (e.g., "$200,000 +/- 10%"). In December 2004, however, XL agreed to Fiserv's proposal that XL insure appraisals generated by a Fiserv program called a HomeValueBot (HVB). HVB stated appraisals somewhat differently than the traditional AVMs. Instead of presenting a single value with a possible percentage variation, the HVB represented appraisals as a range (e.g., "$180,000 to $220,000"). The purpose of HVB appraisals was to afford lenders more flexibility in extending loans. Fiserv believed that given a range, lenders would more easily be able to justify larger loans. In other words, a $210,000 loan was more feasible to underwrite where that value actually existed within a given range of $180,000 to $220,000, as opposed to being within the margin of error of a lower value ($200,000 +/- 10%).

In connection with the introduction of HVB appraisals, XL issued an endorsement to the policy that expanded the definition of "Original Appraised Value" to include "the value of the Secured Property . . . as reported from . . . an automated HomeValueBot (HVB) where the insured appraised value does not exceed the HVB's indicated range of value report collected or requested by the Insured for the Originator on or prior to the extension of the Loan to the Borrower."

Along with its premium payment for each loan that carried an insured appraisal, Fiserv submitted to XL the actual appraisal value that it had used to underwrite the loan. This practice apparently did not change with the introduction of HVB's. Notwithstanding that HVB appraisals stated a range of values, Fiserv's practice was to identify a specific dollar value within the range and to communicate that value to XL. Indeed, a principal of the company that underwrote the policy on XL's behalf testified that the single value Fiserv selected for appraisal purposes "would be covered under the policy subject to the rest of the terms." In some instances, Fiserv's internal computer system would round up the dollar value selected by the lender and report the rounded figure to XL. For example, if the chosen value was $192,101.99, Fiserv might have reported the value to XL as $192,102. This could happen even where the high end of the range developed by the HVB was $192,101.99, making the reported number fall out of the range.

The Lenders began making claims under the policy in the middle of 2005. For nearly four years after the policy was issued, XL paid claims as though "Original Appraised Value" meant the single specific dollar amount the lender identified

from within the HVB range. Thus, if a loan went into default and an in-person appraisal determined that the property should have been appraised at a value less than the value "chosen" by the Lender, XL paid on the claim, even if the market value and the selected value both fell within the range developed by the HVB. XL paid 165 out of 166 such claims during this period.

Most of these early claims were handled by a New York-based XL employee who testified that her area of expertise was fine arts claims and that she relied on loss summary sheets prepared by others. With claims volume increasing, on January 15, 2008 XL sent formal notice to Fiserv that it would cancel the policy, effective April 20, 2008. At the same time, XL transferred its internal claims management to Keri Ryan, who brought in new outside counsel and retained a forensic accountant.

Ryan identified several issues that, in her opinion, led to erroneous payment of claims prior to her assignment. For example, Ryan observed that many claims involved loans where the retrospective appraisal was less than the appraisal value the lender relied on when underwriting the loan, but both appraisal values fell within the HVB range. Ryan took the position that XL merely insured the range and that, because the HVB range was accurate in such cases, the lender had not suffered a loss. Ryan also discovered that some claims involved loans where lenders used values higher than the top of the HVB range (this typically occurred where computers rounded up the appraisal amount upon which the lender relied in underwriting the loan). Ryan believed that these were not covered, because they did not fall within the definition of original appraised value. It is not disputed that XL paid more than 99% of claims before it identified the issues outlined above. It is further undisputed that, after the personnel changes XL instituted, it denied 1,114 claims and paid only 21 claims from June 18, 2008 through October 1, 2010—a payment rate of less than 2%.

Fiserv and the Lenders commenced this action in April 2009 seeking certain declaratory relief, including a declaration that XL must adjust all existing and future claims in accordance with the terms of the Policy and asserting causes of action for breach of contract, violation of the Connecticut Unfair Insurance Practices Act,[2] violation of the Connecticut Unfair Trade Practices Act, and breach of the implied covenants of good faith and fair dealing. They also sought injunctive relief precluding XL from adjudicating claims in a manner inconsistent with the policy and its claims handling practices prior to June 2008.

---

2. Both Fiserv and XL had their place of business in Connecticut. The parties agree that Connecticut law governs their dispute.

In October 2010, the parties both moved for partial summary judgment. Each side argued that the policy's text unambiguously supported its own interpretation. The parties also raised, in the alternative, the possibility that the policy was ambiguous. Their briefs likewise discussed the extrinsic evidence that they contended supports their respective interpretations. By order entered March 23, 2011, the court granted and denied the parties' motions in part.

Plaintiffs appeal from three specific rulings of the court: (1) "Original Appraised Value means the range of value generated by an HVB, as long as the final loan value is not higher than the highest value of the HVB" and that "any retrospective appraisal value that falls within the range is not covered under the Policy," (2) "any loans that exceed the highest value of an HVB value range, even if only by mere cents, are not covered under the Policy" and (3) "the Policy permits XL to inquire into the procedures and requirements of the lenders and [to] deny coverage for any loan not made in accordance therewith."

XL appeals from two specific rulings: (1) that notice of claim is timely if provided within 30 days of either the sale or appraisal of the property, charge-off of the loss, or "any other event that leads the lender to recognize the potential for loss" and (2) Fiserv has an insurable interest in the policy.

On their motion for partial summary judgment, plaintiffs argued that the definition of original appraised value unambiguously indicates that the accuracy of the single value chosen by a lender within the HVB range is what the policy insured and that if the in-person appraised value turned out to be lower, coverage would nonetheless be available, even if the range was accurate because the market value also fell within the range. Regarding XL's position that the policy did not cover appraisals rounded up by Fiserv's computer system to a value above the HVB range, plaintiffs invoked the doctrine of substantial performance that excuses a technical breach of a contract.

The motion court agreed with XL's interpretation of the definition of "Original Appraised Value" for purposes of HVB. It stated: "[s]ince the HVB was not a specific number as were other standard AVM's, but instead was a value range, common sense leads to the conclusion that the Policy only covered loss by lenders where the retrospective appraisal showed a property value below the HVB range . . . Since the HVB gave Lenders a range of values to choose from, and lenders consistently chose to grant loans based on the high value, subsequent retrospective appraisals often resulted in a value lower than the HVB high value but still within the HVB range. In these cases the

HVB was not actually faulty, and thus not a situation intended to be covered under the Policy."

The court rejected plaintiffs' position concerning appraisal values that computers rounded up. It held that "[t]he Policy does not make allowance for substantial compliance but requires precise performance with respect to this provision. . . . Therefore, any loans that exceed the highest value of an HVB value range, even if only by mere cents, are not covered under the Policy."

On appeal, both parties contend that the definition of original appraised value is unambiguous. However, their respective interpretations of the clause are diametrically opposed to each other. Plaintiffs argue that the provision contemplates that lenders would rely on a single appraisal value from the HVB range in underwriting loans and that XL would insure the accuracy of that single value. They assert that the word "value" inherently means a single number and that "[a]ll of the 'value' definitions in the policy—'Original Appraised Value,' 'Faulty Original Appraised Value,' and 'As of Appraised Value'—require a single and specific dollar amount." According to plaintiffs, the term "insured appraised value," which falls within the definition of original appraised value, must also refer to a single dollar amount.

XL, on the other hand, asserts that the language defining original appraised value makes clear that XL insured the accuracy of the range of values generated by the HVB program, not a single value. It parses the definition into two separate elements. The first element, XL claims, plainly provides that original appraised value means the range reported by the HVB program. The second element of the definition, it contends, is a "limit on the use of HVB, providing that the HVB range is the original appraised value only where the 'insured appraised value' does not exceed that range."

"If the terms of [an insurance] policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. However, [w]hen the words of an insurance contract are, without violence, susceptible of two equally responsible interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted" (*Heyman Assoc. No. 1 v Ins. Co. of the State of Pa.*, 231 Conn 756, 770, 653 A2d 122, 130 [1995] [citations omitted]). Further, a court may not read a clause in a policy in isolation, but must consider it in the context of the entire document (*see O'Brien v United States Fidelity and Guar. Co.*, 235 Conn 837, 843, 669 A2d 1221, 1224 [1996]).

That the parties disagree over the definition of original appraised value does not in itself render the provision ambiguous (*Hansen v Ohio Cas. Ins. Co.*, 239 Conn 537, 543, 687 A2d 1262, 1265). Again, that would only be the case if both interpretations were reasonable (*Heyman Assoc.*, 231 Conn at 770, 653 A2d at 130). While the definition was perhaps inartfully drawn, in my view, it is not susceptible to two reasonable interpretations. To the contrary, only Fiserv's interpretation is reasonable. The use of the phrase "insured appraised value" is the key to understanding the meaning of original appraised value. By stating that the "insured appraised value" may not exceed the range, the policy confirms that the accuracy of a single value out of the reported range is being insured, not the accuracy of the range itself. After all, if the thing being insured were the accuracy of the range, as XL and the majority assert, then the definition of original appraised value would have to be read as providing that coverage would only be afforded where the "insured appraised [range of values] does not exceed the HVB's indicated range of value report." This would simply make no sense. The clear intent of the clause is to state (somewhat superfluously, it would seem) that if the value the lender selects is higher than the range in the HVB report, it is not covered.

This is why, in my view, the lower court correctly concluded that selected values that are rounded up by Fiserv's computer system to a number exceeding the high end of the range are not insured, even as a result of simple rounding up to the nearest whole dollar. The original appraised value clause clearly provides that, for the policy to provide coverage, the single value a lender selects must not be higher than the highest value of the range the HVB reports. Indeed, when opposing plaintiffs' argument on the rounding issue, XL acknowledges that the accuracy of the single value selected by a lender is what is insured.

In any event, if "insured appraised value" cannot be understood as indicating, on its face, that original appraised value means a single dollar value, it can when one considers the rest of the policy. The policy defines a loss as "the amount of any principal of a covered Loan that remains unpaid following the sale of the Secured Property, if applicable, by the Originator following a Default, subject to the limitations set forth below in Section III." Section III clarifies that "[t]he Loss payable under this Policy for any covered Loan shall never be greater than the difference between the Original Appraised Value and the As of Appraised Value or the unpaid principal of the loan, whichever is less." Thus, to calculate a loss and determine how much to pay on a claim, XL must make a precise mathematical calcula-

tion. However, it would be impossible to perform this calculation if that part of the equation utilizing original appraised value was a range of numbers, instead of a specific number. Thus, the definition of original appraised value urged by plaintiff in the context of HVB reports must be correct, because only under plaintiffs' interpretation is one able to apply the loss calculation provisions in the policy.

XL's position directly conflicts with the loss calculation provisions in the policy because, if original appraised value were a range of values, one could not determine the extent of an insured's loss. XL asserts that the words insured appraised value "place a limit on the use of HVB," but this avoids the question of whether the word "insured" refers to a single value or a range of values. It is not enough for XL to argue that the policy "plainly" provides that original appraised value refers to a range of values while it ignores critical language within that definition.

Because the plain language of the policy compels the conclusion that the Lenders are insured if the appraisal value they rely on is later found to be inaccurate, whether the in-person appraised value later comes in below the selected value but still within the HVB reported range or lower than the bottom of the range, the motion court should have granted plaintiffs' motion to the extent they sought such a declaration.

Accordingly, I would modify the order to the extent of denying XL's motion for partial summary judgment on the issue of the HVB range and granting plaintiffs' motion to the extent of declaring that XL should adjust all existing and future claims in accordance with the terms of the policy, as described above.